927 A.2d 1

**Garrett CUTLER and Michael Pittman, on behalf of themselves and all Others similarly situated**

v.

**WAL–MART STORES, INC., a Delaware Corporation; Sam's Club, an operating Segment of Wal-mart Stores, Inc.**

**No. 1376, Sept. Term, 2005.**

Court of Special Appeals of Maryland.

June 29, 2007.

Roscoe Jones, Jr., Suzanne Sangree, Baltimore, MD, Charles T. Thompkins (Michael D. Hausfeld, Cohen, Milstein, Hausfeld & Toll, PLLC, on the brief), Washington, DC (Steven M. Pavsner, Jay P. Holland, Claire E. Buchner, Joseph, Greenwald, Laake, PA, on the brief), Greenbelt, MD, for Appellants.

Bruce L. Marcus (Marcus & Bonsib, on the brief), Greenbelt, MD, for Appellees.

Panel: DAVIS, HOLLANDER and MEREDITH, JJ.

MEREDITH, Judge.

Former employees of Wal–Mart and Sam's Club stores in Maryland who claimed they were deprived of benefits and pay for work performed filed a putative class action suit against Wal–Mart Stores, Inc., the parent company of Wal–Mart and Sam's Club. The employees' motion for class certification was denied by the Circuit Court for Prince George's County on the ground that the employees failed to show that common issues predominate over individual issues. The case was later dis-

missed by the circuit court because, absent class certification, the named plaintiffs' claimed damages did not meet the $5,000 threshold for civil cases filed in circuit court.

On appeal, the employees argue that the circuit court abused its discretion in denying the motion for class certification.[1] Because we conclude that the circuit court did not abuse its discretion in finding that individual issues predominate, and such finding provided a legally sufficient basis to deny class certification, we shall affirm the judgment of the circuit court and need not address appellants' arguments regarding evidentiary issues and due process.

## I. Facts and Procedural History

Wal–Mart and its subsidiary, Sam's Club, are nationwide retail chains.[2] Appellants Cutler and Pittman were formerly employed by Wal–Mart in positions paying an hourly wage. On April 23, 2002, these two former employees filed suit against Wal–Mart, seeking to assert a class action. The complaint identified the proposed class of plaintiffs as "all current and former hourly-paid employees of Wal–Mart

---

**1.** The questions set forth by the employees in their brief are as follows:

 1. Whether the circuit court abused its discretion in denying certification of Plaintiffs' class based upon an erroneous finding that Plaintiffs' case hinges on statistical data and survey proof, when the bulk of Plaintiffs' case relies on Wal–Mart's own records, evidence common to the entire class, that Wal–Mart maintains uniform corporate-wide work policies which form the basis of Plaintiffs' claims?

 2. Whether the circuit court abused its discretion in denying certification of Plaintiffs' class on the basis that Plaintiffs' use of experts to explain Wal–Mart's records to prove the bulk of their claims, and to present statistical extrapolation and survey data to prove a small portion of their wage abuse claims, violates Wal–Mart's due process rights?

 3. Whether the circuit court abused its discretion, pursuant to Md. [ ] Rule 2–231(b)(3), in ruling that individual issues predominate over common issues, and thereby denying certification of Plaintiffs' class?

The employees do not contend that the circuit court erred in concluding their individual claims were below the jurisdictional limit of the circuit court. *See* Md.Code (1973, 2006 Repl. Vol.), Courts & Judicial Proceedings Article ("CJP"), §§ 4–401(1) and 4–402(d).

**2.** Although the claims in this case relate to both Wal–Mart and Sam's Club, for simplicity's sake we will refer to both as "Wal–Mart."

Stores, Inc. (including Wal–Mart Stores, Sam's Club and Supercenters) in the State of Maryland from April 12, 1999 to the present[.]" The class excluded salaried employees, customer service managers, pharmacists and personnel managers. At the time of the circuit court's decision in this case, the potential class consisted of more than 60,000 former and present Wal–Mart employees.

The complaint alleged that Wal–Mart had engaged in a "systematic and clandestine scheme" that deprived its hourly employees of rest breaks and meal breaks, and thereby undercompensated hourly employees for the total number of hours worked. The complaint contained the following ten counts: 1) breach of contract for failure to pay wages for off-the-clock work; 2) breach of contract for failure to provide rest and meal breaks; 3) unjust enrichment/restitution; 4) promissory estoppel; 5) breach of implied covenant of good faith and fair dealing; 6) failure to pay timely wages in violation of Maryland labor statutes; 7) failure to pay all wages earned prior to termination in violation of Maryland labor statutes; 8) failure to pay overtime wages in violation of Maryland labor statutes; 9) conversion; and 10) negligent misrepresentation.

In support of their contentions, the employees relied primarily on the Wal–Mart Associate Handbook ("the Handbook") that is provided to all hourly employees upon their hiring. The Handbook, which is uniform for all Wal–Mart stores, details corporate policies, operating procedures, and employee benefits determined by Wal–Mart's corporate headquarters in Bentonville, Arkansas. Cutler and Pittman asserted that the Handbook "embodied the terms of their employment," and that Wal–Mart breached the terms of the employment contract by failing to provide promised rest breaks and meal breaks and by failing to compensate hourly employees for work performed "off the clock", *i.e.*, not reflected in the employees' time records.

The Handbook, however, contains two disclaimers. One disclaimer states: "This handbook is a guide, not a legal contract." The second disclaimer, which is part of an acknowl-

edgment that each employee must sign, states: "This hand-book is intended solely as a general information guide....
The policies and benefits in this handbook are for your infor-mation and do not constitute terms or conditions of employ-ment.... This handbook is not a contract." The acknowledg-ment form each employee must sign contains the following attestation:

I have received and read this handbook as well as this Acknowledgment and ... I fully understand the contents of both as they relate to my employment with Wal–Mart. I understand that the information contained in this handbook are [sic] guidelines only, and are in no way to be interpreted as a contract.

Cutler and Pittman argue that, despite the disclaimers, the Handbook, along with the documents setting forth Wal–Mart's corporate policies, operate to form an employment contract, and that Wal–Mart's failure to provide certain benefits de-scribed in the Handbook constitutes an actionable breach of contract. The portion of the Handbook addressing rest breaks and meal breaks provides:

Associates will be provided break and meal periods during their scheduled work shift. Associates are paid for up to two break periods per work shift. No associate should work over six hours without taking at least a 30–minute meal period. Remember to clock in and out for meal periods. Associates should not be required nor requested to perform work during their break and/or meal periods. Associates whose break or meal period is interrupted to perform work will be compensated at the appropriate rate of pay and may be provided an additional break or meal period.

In addition to the statements in the Handbook, a Wal–Mart corporate policy document titled "PD–07" also addresses rest breaks and meal breaks. PD–07 provides that Associates who work fewer than three hours in a shift do not receive a rest break, but employees who work three to six hours in a shift receive one fifteen-minute rest break, and employees who work more than six hours in a shift receive two fifteen-minute

rest breaks. PD–07 also states that any employee who works more than six hours in a shift "will be provided a meal period." Wal–Mart policy dictates that meal breaks must last at least thirty minutes, but that, with the supervisor's permission, meal breaks may last up to an hour. Although employees are supposed to be compensated for the prescribed fifteen minute rest breaks, they do not receive compensation for meal breaks. The provision of PD–07 which addresses Wal–Mart's official policy regarding the interruption of an employee's rest break or meal break by a supervisor or manager states:

> Supervisors and Managers may not require nor request Associates to perform work during their break and meal periods, except in extreme emergencies where no other Associate is available. Hourly Associates whose break or meal period is interrupted will receive compensation for the entire period at their regular rate of pay and will be allowed an additional break or meal period.

In addition to their claims that they were deprived of rest breaks and meal breaks, Cutler and Pittman allege that they were required to do work off the clock, in violation of the provision in PD–07 stating that managers should not request employees to work during breaks "except in extreme emergencies," and in violation of Wal–Mart's policy that employees should not perform work while off the clock. Wal–Mart's corporate policy regarding off-the-clock work is stated in a document titled "PD–43," which provides that "[n]o Wal–Mart Associate should perform work for the Company without compensation.... It is a violation of the law and Company policy to work off the clock. Associates who do work off the clock will be paid for such time, and the Coaching policy will be used to correct the problem." [3]

In order to electronically document time worked and breaks taken, Wal–Mart employees are required to swipe electronic ID cards when beginning or ending work periods or meal

---

3. "Coaching" is Wal–Mart's terminology for reprimands, either verbal or written, used by supervisors to address employee violations of company policy, poor job performance, and similar employment issues.

breaks. Prior to February 10, 2001, employees were required to swipe in and out for paid breaks as well. The swipe data is used for payroll generation, and is subject to review and adjustment. Appellants' complaint asserted that supervisors regularly used their power to adjust time records in a manner that deprived employees of pay for hours actually worked and compensation for missed breaks.

On May 23, 2003, Cutler and Pittman filed a motion for class certification, defining the class as all employees of Wal–Mart in Maryland from April 12, 1999, through May 23, 2003, excluding salaried and managerial employees. A hearing on the class certification motion was held May 5, 2004. On June 8, 2004, the circuit court issued a memorandum and order denying the motion. In its written memorandum of opinion, the circuit court "assume[d] without finding" that the appellants met the requirements of Maryland Rule 2–231(a), which lists the following four prerequisites for certification of a class action:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Bypassing analysis of whether appellants satisfied these four prerequisites for class action certification listed in Rule 2–231(a), the circuit court instead focused its analysis on whether each count of the complaint met the additional criteria for class actions set forth in Rule 2–231(b)(3). Rule 2–231(b)(3) requires that, "in addition" to the prerequisites listed in Rule 2–231(a), the court must also "find[ ] that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

As to the first two counts of the complaint, alleging breach of contract, the circuit court found, based on the disclaimers in the Handbook, that there was no written contract for employment. Citing *Hrehorovich v. Harbor Hospital*, 93 Md.App. 772, 614 A.2d 1021 (1992), *cert. denied*, 330 Md. 319, 624 A.2d 490 (1993), the circuit court explained that if any employment contracts existed, they could not be based on the uniform Handbook distributed to all of Wal–Mart's hourly employees in Maryland. As a consequence, in order to prosecute the employees' breach of contract claims, "testimony will vary as to how [each employee's] contract was formed, the terms of the contract, and whether any such contract existed." The court further found that appellants' proffered expert testimony (drawing general conclusions based upon analysis of Wal–Mart's time-clock records and a survey of employees inquiring about missed breaks and unpaid, off-the-clock work) was insufficient to "cure these individual discrepancies" among the employees regarding the formation and terms of the potentially thousands of implied contracts created under circumstances unique to each individual employee.

With respect to count three of the complaint, appellants' unjust enrichment claim, the circuit court noted that "[t]he measure of damages for unjust enrichment is the known gain to the defendant," and that "evaluation would require individual assessments of whether or not any benefit was conferred and accepted, retained, or even known to [Wal–Mart]."

The court noted that count four of the complaint, which alleged promissory estoppel, would "require[ ] proof of reliance upon a clear and definite promise." The court further observed: "Reliance varies from individual to individual and consequently individual, not common, issues predominate here." The court concluded that the claims asserted in count ten, alleging negligent misrepresentation, were not appropriate for class certification for the same reasons as those in count four.

The court rejected appellants' arguments for class certification as to count five, which asserted a breach of the covenant

of good faith and fair dealing, on the ground that proof of a breach of the covenant of good faith and fair dealing is "dependent on the existence of an employment contract for a definite term." Because the court had already found, for the purpose of evaluating counts one and two, that the Handbook did not constitute a written employment contract and that any contract would have to be proven on an individual basis, the court concluded that individual issues predominated as to count five as well.

Counts six, seven and eight contained statutory claims for wages unpaid. The court again found that individual issues predominated, explaining:

> In these claims, an individual analysis of time records and why such wages were not paid would require an assessment of not only policies within the individual store, but policies within the individual department within the store. This would require a showing of evidence of whether work was performed while not reporting it, whether there was a proper or improper recordation of breaks and/or hours worked, and whether or not the time was ultimately corrected and paid, among other considerations.

The court did not have to address count nine, which alleged conversion, because that count had been dismissed prior to the hearing on the motion for class certification.

On November 4, 2004, the employees filed a motion to revise the order denying class certification. On January 24, 2005, the circuit court denied the motion to revise. On June 8, 2005, Wal–Mart filed a motion to dismiss, or in the alternative, for summary judgment. On August 10, 2005, the circuit court entered an order dismissing the case on the ground that, absent class certification, each of the named plaintiffs' claims for damages fell short of the $5,000.00 jurisdictional threshold for cases filed in Maryland circuit courts, as set forth in CJP § 4–402(D)(1)(I).

Cutler and Pittman filed a notice of appeal on August 17, 2005. On appeal, appellants contest only the denial of the

motion for class certification with respect to counts one, two, three, five, six, seven and eight.

## II. Standard of Review

 At the outset, we note that there is no statutory or constitutional right to pursue by way of a class action the various claims that were the subject of appellants' complaint. Rather, a class action is a procedural device, created by the judiciary's adoption of a court rule to facilitate management of multiple similar claims. Maryland Rule 2–231 provides that the circuit court may order pursuit of claims by way of a class action if certain requirements are met.[4]

---

4. Rule 2–231 provides, in relevant part:

(a) **Prerequisites to a class action.** One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

(b) **Class actions maintainable.** Unless justice requires otherwise, an action may be maintained as a class action if the prerequisites of section (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class that would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions, (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class, (C) the desirability or undesirability of concentrating

 We review the circuit court's decision to grant or deny class certification for abuse of discretion. *Philip Morris v. Angeletti,* 358 Md. 689, 726, 752 A.2d 200 (2000) (hereafter *"Angeletti"*). This deferential standard of review is based upon the "recognition that the basis of the certification inquiry is essentially a factual one, and thus deference is due." *Creveling v. GEICO,* 376 Md. 72, 90, 828 A.2d 229 (2003). Review of the circuit court's determination for abuse of discretion "appropriately recognizes the factual nature of a class certification inquiry and a trial court's power to manage its docket." *Id.* at 91, 828 A.2d 229.

 An appellate court may find an abuse of discretion when "no reasonable person would take the view adopted by the [trial] court, or when the court acts 'without reference to any guiding rules or principles.' " *In re Adoption/Guardianship No. 3598,* 347 Md. 295, 312, 701 A.2d 110 (1997) (quoting *North v. North,* 102 Md.App. 1, 13, 648 A.2d 1025 (1994)(alteration in original)). A reviewing court may also conclude that the circuit court has abused its discretion when "the ruling under consideration is 'clearly against the logic and effect of facts and inferences before the court,' . . . 'or when the ruling is violative of fact and logic.' " *Id.* (internal citations omitted). The Court of Appeals has also defined "abuse of discretion" as " 'discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.' " *Touzeau v. Deffinbaugh,* 394 Md. 654, 669, 907 A.2d 807 (2006) (quoting *Jenkins v. City of College Park,* 379 Md. 142, 165, 840 A.2d 139 (2003) (emphasis not included)). In reviewing a circuit court's decision for abuse of discretion, this Court is mindful that "[q]ues-

the litigation of the claims in the particular forum, (D) the difficulties likely to be encountered in the management of a class action.

(c) **Certification.** On motion of any party or on the court's own initiative, the court shall determine by order as soon as practicable after commencement of the action whether it is to be maintained as a class action. A hearing shall be granted if requested by any party. The order shall include the court's findings and reasons for certifying or refusing to certify the action as a class action. The order may be conditional and may be altered or amended before the decision on the merits.

tions within the discretion of the trial court are 'much better decided by the trial judges than by appellate courts, and the decisions of such judges should only be disturbed where it is apparent that some serious error or abuse of discretion or autocratic action has occurred.' " *Adoption/Guardianship No. 3598, supra,* 347 Md. at 312, 701 A.2d 110 (quoting *Northwestern National Insurance Co. v. Samuel R. Rosoff, Ltd.,* 195 Md. 421, 436, 73 A.2d 461 (1950)).

■ In contrast to the deference given to the factual findings and discretionary rulings of the circuit court, however, we review *de novo* any issues regarding the circuit court's application of the legal standards for granting or denying class certification. *Creveling, supra,* 376 Md. at 91, 828 A.2d 229.

### III. Discussion

■ The party seeking class certification bears the burden of proving that the proposed class meets all the requirements of Rule 2–231. *Creveling, supra,* 376 Md. at 89, 828 A.2d 229. The circuit court, in its consideration of a motion for class certification, may not review the merits of the case. *Id.* The circuit court must accept as true the named plaintiff's allegations regarding the elements of class certification, although the court "may look beyond the pleadings to determine whether class certification is appropriate." *Id.*

While Rule 2–231(a) sets forth the four threshold prerequisites for class certification—numerosity, commonality, typicality, and adequacy of representation—the Court of Appeals has noted that those four requirements "are necessary but not alone sufficient; a putative class also must fall into one of three subcategories of Rule 2–231(b)." *Id.* at 88, 828 A.2d 229. In this case, appellants chose to rely on Rule 2–231(b)(3), asserting that common issues of law and fact predominate over individual issues and that a class action is the most fair and efficient method of adjudicating their claims.

■ In ruling on a motion for class certification where the named plaintiffs rely on Rule 2–231(b)(3), a circuit court must make two findings in order to grant class certification: (1) that

common issues predominate over individual issues; and (2) that a class action is superior to other methods of adjudicating the claims fairly and efficiently. *Angeletti, supra,* 358 Md. at 762, 752 A.2d 200. In *Angeletti,* the Court of Appeals also noted that "the less demanding prerequisite of commonality in Rule 2–231(a) is necessarily subsumed in the more exacting requirement of predominance of common issues over individual questions, found in Rule 2–231(b)(3)." *Id.* at 737, 752 A.2d 200. In this case, the circuit court assumed, *arguendo,* that appellants had met the requirements of Rule 2–231(a), and concluded that, even if the four threshold prerequisites were satisfied, appellants could not meet the more stringent requirements of Rule 2–231(b)(3). The circuit court therefore did not reach the issue of whether a class action was superior to other methods of adjudication in this case.

### A. Counts One and Two: Breach of Contract Claims

With regard to counts one and two of the complaint, the circuit court's finding that the Handbook did not constitute a contract rendered the issues on those counts necessarily individual in nature. Citing this Court's decision in *Hrehorovich, supra,* 93 Md.App. at 793, 614 A.2d 1021, the circuit court concluded that the prominent disclaimers in the Handbook precluded a finding that the Handbook could provide a basis for common contractual claims. In *Hrehorovich,* we said that although "personnel policies may give rise to contractual rights if they are properly expressed and communicated to the employee in a fashion that creates a reasonable basis for the employee's reliance on the provisions," disclaimers can effectively prevent such contractual rights from arising. *Id.* at 793, 614 A.2d 1021. We explained: "[R]eliance on expressed personnel policies and procedures is precluded where those same policies clearly and effectively disclaimed any contractual intent." *Id.* at 794, 614 A.2d 1021 (citing *Castiglione v. Johns Hopkins Hospital,* 69 Md.App. 325, 339–41, 517 A.2d 786 (1986), *cert. denied,* 309 Md. 325, 523 A.2d 1013 (1987)). *Accord Bagwell v. Peninsula Regional Medical Center,* 106 Md.App. 470, 494, 665 A.2d 297 (1995) (because of clear

disclaimer in handbook, employee "cannot reasonably assert justifiable reliance on any of the terms of the Handbook"), *cert. denied,* 341 Md. 172, 669 A.2d 1360 (1996).

In this case, the disclaimers were quite clear. The first, which appears in the "Welcome" section of the Handbook, states: "This handbook is a guide, not a legal contract. . . . No handbook can cover everything. The rules and policies in this handbook may change." The other disclaimer, which states plainly that "this handbook is not a contract," appears on the final page of the Handbook in an acknowledgment form that new associates must sign, attesting to the following statement: "I understand that the information contained in this handbook are guidelines only, and are in no way to be interpreted as a contract."

The employees argue that, despite the language of the disclaimers, the Handbook does not preclude the finding of an implied contract common to all members of the proposed class. The employees assert that, in addition to the language in the Handbook regarding rest breaks, meal breaks, and off-the-clock work, they rely on the statements in PD–07 and PD–43, as well as statements made at employee orientation or by supervisors. There are two primary flaws in this argument.

First, the policy statements set forth in PD–07 and PD–43 were included in the Handbook almost verbatim, and were specifically disclaimed as being contractual obligations. Furthermore, this Court has cautioned that "not every statement made in a personnel handbook or other publication will rise to the level of an enforceable covenant. . . . [G]eneral statements of policy are no more than that and do not meet the contractual requirements for an offer." *Staggs v. Blue Cross of Maryland,* 61 Md.App. 381, 392, 486 A.2d 798 (citations omitted), *cert. denied,* 303 Md. 295, 493 A.2d 349 (1985).

The second flaw in appellants' argument is that, to the extent appellants rely on representations made during employee orientation or made by managers to the employees under their supervision, such statements illustrate the circuit court's point that the inquiry into any implied contract arising

from those statements must be individualized, and is not common to the entire class. The facts which form the basis for an employee's claim that Wal–Mart is liable for damages under an implied contract arising from the representations made to associates at one Wal–Mart store by one Wal–Mart manager would differ from those that might prove the existence of an implied contract arising at another Wal–Mart store at another time, based on representations by a different manager.

■■■ Appellants also argue that the existence of an implied contract is an issue that must be decided on the merits, and that class certification should not address the merits of the asserted claims. We do not agree that the circuit court ruled on the merits of the asserted claims. The circuit court, in finding that no implied contract *common to the class* existed, did not impermissibly address the merits, but simply decided a factual issue necessary for ruling on the motion for class certification. Because appellants presented no evidence that tended to show that there was an implied contract common to all, or even most, members of the class, the circuit court properly concluded that the possible existence of thousands of implied contracts, one for each member of the proposed class, warranted a finding that individual issues predominated on appellants' contract claims. The circuit court correctly concluded that, absent a contract applicable to the entire class of Wal–Mart employees, the existence, formation, and terms of any implied employment contract would vary among employees. Furthermore, the alleged breaches of these implied contracts by supervisors and managers at individual Wal–Mart stores also give rise to individual, not common, factual and legal issues.

Several other jurisdictions addressing similar putative class action claims against Wal–Mart have reached the same conclusion with respect to the predominance of individual issues. The Court of Appeals for the 14th District of Texas reversed the trial court's grant of class certification in *Wal–Mart Stores, Inc. v. Lopez,* 93 S.W.3d 548, 557 (2002), on the ground

that individual issues predominated. With regard to the proposed class's contract claims, the Texas court said:

[I]ndividual issues regarding the formation of 350,000 contracts in this case will predominate over any common issues. Appellees claim Wal–Mart made express contractual offers of rest and meal breaks during the orientation process. Because each orientation session was conducted by different Wal–Mart personnel at different stores, proof of an oral contract with each class member will require a determination of the terms of the contract through offer and acceptance. Any determination concerning a "meeting of the minds" necessarily requires an individual inquiry into what each class member, as well as the Wal–Mart employee who allegedly made the offer, said and did. A determination must also be made as to the authority of each Wal–Mart manager who allegedly made such an offer and each employee's belief regarding whether that manager had or lacked authority to make the offer.

Even if appellees establish Wal–Mart had 350,000 oral contracts to provide rest and meal breaks, individual issues regarding the alleged breach of each contract will also predominate over common issues.

*Id.* But *cf. Iliadis v. Wal–Mart Stores, Inc.,* 191 N.J. 88, 922 A.2d 710 (2007) (reversing the trial court's denial of class certification on the ground that the existence of individual issues with respect to the class's contract claims should not preclude class certification.)

In reaching the conclusion that individual claims predominated in *Lopez,* the Texas court cited *Basco v. Wal–Mart Stores, Inc.,* 216 F.Supp.2d 592, 602 (E.D.La.2002), in which a federal district court in Louisiana concluded that the predominance of individual issues precluded class certification, saying: "At trial, each plaintiff will be required to establish the existence of a contract with defendant through offer and acceptance and prove the terms of the contract and it is possible that no two plaintiffs' allegations concerning formation or terms of their contract will be the same."

**B. Count Five: Claims for Breach of the Implied Covenant of Good Faith and Fair Dealing**

■■■ The circuit court also correctly concluded that appellants' claims under count five, alleging breach of the covenant of good faith and fair dealing, are similarly inappropriate for class action. As this Court held in *Mount Vernon v. Branch,* 170 Md.App. 457, 471–72, 907 A.2d 373 (2006), *cert. denied,* 397 Md. 397, 918 A.2d 469 (2007), Maryland law does not recognize an independent cause of action for breach of the implied covenant of good faith and fair dealing. A breach of that implied covenant simply supports "another cause of action at law, *e.g.,* breach of contract[.]" *Id.* at 472, 907 A.2d 373. In *Mount Vernon,* we explained:

> The implied duty of good faith prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract. . . . [T]his duty is merely part of an action for breach of contract, and so, because [one count] already states a claim for breach of contract, [the count purporting to state a claim for breach of the implied duty of good faith] does not state a different claim and will be dismissed.

*Id.* (alterations in original)(internal quotes and citations omitted).

Because we have already concluded that appellants' contract claims involve predominately individual issues, appellants' claims based upon alleged breaches of the implied duty of good faith and fair dealing also necessarily involve predominately individual issues, as they are "merely part of" the contract claims.

**C. Counts Three, Six, Seven, and Eight: Claims for Failure to Pay for Work Performed Off the Clock**

■■■ Appellants' claims based on alleged failure to pay wages due for off-the-clock work under counts three, six, seven, and eight also involve predominately individual issues. Evidence of each class member's time records, as well as individual explanations for breaks missed and individual testimony regarding work performed off the clock, would be

required in order for the employees to prove their claims of unjust enrichment and violation of Maryland labor laws. Each of these counts would, at the very least, require individualized evidence as to whether each class member had ever in fact worked off the clock.

As to count three, alleging unjust enrichment, the circuit court correctly noted that "[t] he measure of damages for unjust enrichment is the known gain to the Defendant. This evaluation would require individual assessments of whether or not any benefit was conferred and accepted, retained, or even known to the Defendant." With regard to the statutory claims for off-the-clock work, a similar individual analysis of Wal–Mart's culpability would be required with respect to each class member alleging that the employer's conduct had violated Maryland labor law.

Appellants contend that their claims arising from off-the-clock work can be proven by common evidence, and proffer Wal–Mart time and payroll records, statistical data, and survey results as proof that Wal–Mart's "standardized and corporate-wide practices regularly caused Wal–Mart's hourly employees to work off-the-clock and through rest and meal breaks." Through affidavits of three proposed experts, appellants proffered that they could provide generalized evidence that Wal–Mart regularly required its hourly employees to work off the clock.

One of appellants' proposed experts, Dr. Christina Banks, intended to survey Wal–Mart's hourly employees in Maryland, asking them to recall whether they had ever been asked to work while off the clock. The second expert, Dr. Martin Shapiro, asserted that he had developed a methodology for comparing Wal–Mart's time records to Wal–Mart's electronic records indicating which hourly employees were logged onto cash registers to determine whether any employees were working while off the clock. Prior to February 10, 2001, hourly employees were required by Wal–Mart to clock in and out for all rest breaks. As of February 10, 2001, this procedure was no longer required. To overcome the problem of

evaluating off-the-clock work when employees were not required to clock out for breaks, appellants proffered the affidavit of Dr. Richard Drogin, who submitted that, using a random sample of data from Wal–Mart's time records prior to the 2001 change in the clock-out policy for rest breaks, he could "extrapolate from that sample to infer the quantity of shorted or denied rest and meal breaks for the entire class."

Appellants emphasize that the contemplated survey regarding employees' experience with off-the-clock work and the statistical extrapolation data proposed for the purpose of showing that associates worked through their fifteen-minute breaks is necessary to prove only "a small portion" of their claims. The primary flaw in this assertion is that appellants have failed to show that *any* of the off-the-clock claims are issues common to the entire class of 60,000–plus former and present Wal–Mart associates.

The Court of Appeals has said that " 'an issue of law or fact should be deemed 'common' only to the extent its resolution will advance the litigation of the *entire* case.' " *Creveling, supra,* 376 Md. at 92, 828 A.2d 229 (quoting *Angeletti, supra,* 358 Md. at 736, 752 A.2d 200) (emphasis added). Even if appellants' expert reports were accepted as valid evidence that "standardized and corporate-wide practices regularly caused Wal–Mart's hourly employees to work off-the-clock and through rest and meal breaks," the reports would not suffice to prove that the off-the-clock claims apply to all of the class members. As the circuit court noted, proof of that issue would require individual inquiry into "whether work was performed while not reporting it, whether there was a proper or improper recordation of breaks and/or hours worked, and whether or not the time was ultimately corrected and paid[.]"

The difficulty of proving that common issues predominate in such a broadly defined class has led courts in several other jurisdictions to deny class certification in similar cases against Wal–Mart. The Ohio Court of Appeals concluded in *Petty v. Wal–Mart Stores, Inc.,* 148 Ohio App.3d 348, 354–55, 773 N.E.2d 576, 580–81 (2002), that the class, defined as "all past

and present Wal–Mart employees," had been "expanded so far beyond any rational relationship to the plaintiffs' theory of recovery that no common issues predominate." The Ohio court explained:

It is now well established that "a claim will meet the predominance requirement when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individual position." This requires a generalized body of evidence sufficient to prove or disprove an issue, not just some generalized evidence that is arguably relevant to an issue. *Cope v. Metro. Life Ins. Co.* (1998), 82 Ohio St.3d 426, 429–30, 696 N.E.2d 1001, citation omitted.

\* \* \*

The issues in this case are individual to each putative plaintiff. For example, there is evidence that some of the plaintiffs were expressly required to work off the clock by their managers, while others perceived pressure and thought that they had to do so. Some of the plaintiffs testified that they merely chose to work off the clock. There are also issues regarding whether each of the managers in the more than one hundred Ohio stores knew that their employees were working off the clock, and whether they knowingly permitted them to do so. Also, there is evidence that some plaintiffs did not bother to clock in or out regardless of whether they took their breaks and meals, and that some purposely chose not to take their breaks and meals for reasons unrelated to work, e.g., some wanted to leave work early, so they skipped breaks and meals, and one putative plaintiff who was trying to quit smoking did not take breaks in order to avoid the temptation to smoke.

*Id.* at 355–56, 773 N.E.2d at 581–82.

In *Harrison v. Wal–Mart Stores, Inc.,* 170 N.C.App. 545, 549, 613 S.E.2d 322, 327 (2005), the North Carolina Court of Appeals affirmed the trial court's denial of class action certification, in part on the basis that "the proposed class included

individuals who were not subject to the wage and hour violations that are the basis of Plaintiffs' claims[.]" The North Carolina appellate court found no error in the trial court's determination that the evidence indicated that the class members did not have a uniform understanding of their terms of employment, that some class members claimed to have worked off the clock but offered no explanation for why they did so, and that "many putative class members testified that they experienced none of the alleged problems." *Id.* at 553, 613 S.E.2d at 328–29. Accordingly, the court concluded that, with more than 350,000 members working in various positions at various times in various stores around the state, individual issues predominated. *Id.* at 554, 613 S.E.2d at 329.

As in *Petty* and *Harrison*, the circuit court in this case had before it evidence that appellants' claims did not affect the entirety of the class. Wal–Mart provided affidavits of more than forty Maryland Wal–Mart associates who denied missing rest or meal breaks or working off the clock. Furthermore, appellants proffered no evidence, other than the proffered expert statistical analysis and proposed surveys, of the prevalence of the alleged off-the-clock work in Wal–Mart's Maryland stores.

We recognize that other jurisdictions have granted class certification in similar lawsuits filed by Wal–Mart employees against Wal–Mart. In *Dukes v. Wal–Mart Stores, Inc.*, 474 F.3d 1214 (9th Cir.2007), the Ninth Circuit, applying California law, affirmed the circuit court's grant of class certification to present and former female Wal–Mart employees claiming sex discrimination. The Ninth Circuit found that the employees, relying on statistical data, employee surveys, and anecdotal evidence, had met the burden of proving commonality of issues under Federal Rule 23(a). *Id.* at 1231. The court noted that, in other cases in the Ninth Circuit, "Rule 23(a)(2) has been construed permissively. All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal

remedies within the class." *Id.* at 1225, quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir.1998).

In *Iliadis, supra,* the Supreme Court of New Jersey reversed the trial court's denial of class certification, explaining that "New Jersey courts ... have consistently held that the class action rule should be liberally construed," and that, in New Jersey, "a class action should lie unless it is clearly infeasible." 191 N.J. at 103, 922 A.2d at 718, (internal quotes and citations omitted).

Maryland does not share the liberal construction of the class action rule espoused by the Ninth Circuit in *Dukes* and by the Supreme Court of New Jersey in *Iliadis.* The more exacting analysis of the class certification requirements in *Lopez, Basco, Petty,* and *Harrison* is more closely aligned with the Court of Appeals's interpretation of Md. Rule 2–231 articulated in *Angeletti* and *Creveling.* Under Maryland case law, an issue is common to a class of plaintiffs " 'only to the extent its resolution will advance the litigation of the *entire* case.'" *Creveling, supra,* 376 Md. at 92, 828 A.2d 229 (quoting *Angeletti, supra,* 358 Md. at 736, 752 A.2d 200)(emphasis added).

For the reasons set forth above, we conclude that the circuit court did not abuse its discretion in ruling that the predomination of individual issues over common issues made it inappropriate to certify the claims asserted by the plaintiffs in this case as a class action. Accordingly, we affirm the judgment of the Circuit Court for Prince George's County denying appellants' motion for class certification.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**